'09 CIV 7391

William J. Honan
Christopher R. Nolan
Warren E. Gluck
HOLLAND & KNIGHT LLP
195 Broadway
New York, New York 10007-3189
Tel.:   (212) 513-3200
Fax:   (212) 385-9010
E-mail: bill.honan@hklaw.com
        chris.nolan@hklaw.com
        warren.gluck@hklaw.com

Attorneys for Plaintiff,
*Golden Ocean Group Limited (Bermuda)*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

GOLDEN OCEAN GROUP LIMITED (BERMUDA)

Plaintiff,

- against -

G.T. GROUP HOLDING A/K/A G.T GROUP A/K/A
G.T. GROUP SAL HOLDING

Defendant.

</td><td>

09 CV _____ ( __ )

**VERIFIED**
**COMPLAINT**

</td></tr>
</table>

Plaintiff, Golden Ocean Group Limited (Bermuda) ("Golden Ocean"), by and through its

attorneys, Holland & Knight LLP, for its verified complaint against G.T. Group Holding a/k/a

G.T. Group a/k/a G.T. Group SAL Holding (collectively "GT"), alleges as follows:

1.    This is a case of admiralty and maritime jurisdiction as hereinafter more fully

appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil

Procedure.

1

2.    At all times material herein, plaintiff Golden Ocean was and is a business entity organized and existing under the laws of a foreign nation and maintains an address at P.O Box HM 1593, Par-la-Ville Place, 14 Par-la-Ville Road, Hamilton, Bermuda.

3.    Upon information and belief, at all times material herein, defendant GT is and was a business entity organized and existing under the laws of a foreign nation and maintains an address at GETO Group Bldg Sarkis and Bakhos Street, P.O. Box 90750, Jdeideh Metn, Lebanon.

4.    The a/k/a G.T. Group is included because GT personnel have email footers referring to "G.T. Group." *See, infra*, Verified Complaint ¶ 12; Exhibit 4.

5.    The a/k/a G.T. Group SAL Holding is included because GT has previously provided an invoice dated February 13, 2009 to Golden Ocean requesting payment be made to "G.T. Group SAL Holding" referencing "Correspondent Bank in New York:  BANK OF NEW YORK, New York."  A true and correct copy of this invoice, signed at the bottom of the invoice by G.T. Group Holding, but with a watermark for G.T. Group SAL Holding, is annexed hereto as Exhibit 1.

**Golden Ocean's Demurrage Claim Against GT**

6.    On or about April 15, 2009, Golden Ocean, as disponent owner, and non-party The Ministry of Trade of the Republic of Iraq ("IMT"), as charterer, entered into a voyage charter (the "Charter") whereby IMT chartered the vessel M/V Maria Salamon (the "Vessel") for the carriage of wheat from Port Constanza, Romania to Umm Qasr, Iraq (the "Charter"). A true and correct copy of the Charter is attached as Exhibit 2.

2

7.     Clauses 15-18 of the Charter govern demurrage obligations and set demurrage at $23,000.00 per day, pro-rata. Clause 18 provides that any demurrage incurred at the port of loading is to be paid by the cargo "Suppliers" (i.e. the shipper).

8.     Defendant GT is the shipper of the wheat for this Charter, as well as previous charter party agreements between Golden Ocean and IMT with similar terms.

9.     On at least five other occasions, the parties have entered into fixtures, charter parties, and had bills of lading issued, all of which involved identical demurrage terms.

10.     The Vessel arrived at Port Constanza, Romania on June 1, 2009. On June 26, 2009, the parties agreed to substitute the vessel M/V Myron N (the "Substituted Vessel") for the Vessel M/V Maria Salamon. A true and correct copy of the fixture evidencing the parties' substitution agreement (the "Substitution Fixture") is attached hereto as Exhibit 3.

11.     The Substitution Fixture similarly provides for a demurrage rate of $23,000.00 per day, and similarly provides that "at loadport, dem[urrage]/des to be settled directly between supplier and owners." (emphasis added). The Substitution Fixture further notes that "Vessel has been stemmed with supplier GT Group. The supplier has also confirmed cargo availability per their below message." (emphasis added).

12.     In an email from Mr. George Abdelnour of GT, dated June 9, 2009, GT acknowledged the vessel substitution and praised the parties' cooperation in that regard. In addition, GT specifically agreed that the laytime incurred during the Vessel's aborted call at Port Constanza (from June 1 to June 9) would be added to any laytime-incurred by the Substitute Vessel with respect to the final demurrage calculation. A true and correct copy of the June 9, 2009 email, sent by Mr. George Abdelnour of "G.T. Group," is attached hereto as Exhibit 4.

13.    Loading operations for the Substitute Vessel were complete on August 19, 2009. At the completion of loading, demurrage was due and payable by GT (for the Vessel between June 1 and June 9 and the Substituted Vessel from July 27 onward); providing Golden Ocean the right to exercise a maritime lien for the outstanding amount. A true and correct copy of the draft ocean bill of lading for the Substitute Vessel, referencing G.T. Group Holding as the "shipper," is attached hereto as Exhibit 5. The bill of lading references the Charter and incorporates charter terms. The official bill of lading has not been issued at the time of the filing of this action.

14.    The Substitute Vessel presently remains at Port Constanza and cannot sail due to customs clearance and bill of lading issues, the latter of which is claimed by GT. Golden Ocean's has explained to GT that the demand of issuing a bill of lading prior to customs clearance departs from customary shipping practice. Regardless, as of August 19, 2009, 20 days, 12 hours of demurrage has been incurred, amounting to a total of $471,500.00 (20.5 days x $23,000.00 per day). A true and correct copy of the Port Constanza laytime statement of facts and demurrage calculation is attached hereto as Exhibit 6 (the "Demurrage Statement").

15.    Golden Ocean has issued a demand for payment of demurrage to GT. In an email dated August 20, 2009, GT acknowledged demurrage payments are due from GT. However, instead of making the demurrage payments, GT seeks to issue an undertaking and stagger payments due to a shortage of available funds.

16.    Because of GT's failure to pay demurrage due and owed, and its admitted financial difficulties, Golden Ocean seeks security before this Court on an expedited basis.

17.    As a result of to GT's payment failures, Golden Ocean has incurred damages in the principal amount of $471,500.00, and continues to incur damages at the rate of $23,000 per day.

4

18.    Clause 37 of the Charter and the terms of the Substitute Fixture provide for arbitration of disputes arising out of the Charter in London under Iraqi law, and "the arbitrators shall be entitled to assume that there is no contradiction between Iraqi [and][sic] English substantive law, and in the event that is [sic], English substantive law to apply."

19.    While all disputes arising out of charter party will be arbitrated in London, and Golden Ocean intends to commence arbitration proceedings against GT in London, the action herein is submitted in accordance with Rule B of the Supplemental Rules for Admiralty and Maritime Claims of the Federal Rules of Civil Procedure as well as 9 U.S.C. §8, and thus this action is not and cannot be considered a waiver of the charter party 's arbitration clause.

20.    Under Iraqi law (which is identical to or shall otherwise substituted by English law) arbitration awards regularly include reasonable interest and costs, including a reasonable allowance for attorneys' fees. Attorneys' fees and arbitration costs in this matter are estimated to be $150,000.

21.    It is estimated that it will take approximately three years to resolve this matter in London arbitration. Under relevant English law and arbitration procedure, a reasonable interest rate is 3.5% compounded annually, resulting in the following estimated interest and attorneys' fees in addition to Golden Ocean's principal claim:

| | | |
|---|---|---|
| Interest (3.5% on $471,500.00 for three years compounded annually): | $ | 47,481.50 |
| Attorneys' fees and costs: | $ | 150,000.00 |
| Principal Claim: | $ | 471,500.00 |
| **Total Sought:** | **$** | **668,981.50** |

22.     It is common practice in the maritime industry to require that payments be made in U.S. Dollars and payments are made in U.S. Dollars in conformance with these requirements. The Charter and Substitute Fixture required payment from GT in U.S. Dollars and GT has received payments in U.S. Dollars in connection with previous, similar, charter party agreements in the past. International electronic fund transfers in U.S. Dollars pass through intermediary banks in New York.  In addition, GT has acknowledged US Dollar transactions are processed through its intermediary bank, The Bank of New York, in a previous invoice. *See* Verified Complaint ¶ 5; Exhibit 1.

### REQUEST FOR ATTACHMENT

23.     G.T. Group Holding a/k/a G.T. Group a/k/a G.T. Group SAL Holding is not found within the Southern District of New York but does transact business in U.S. Dollars as evidenced by the charter party at issue here.  Hence, GT does have, or will have during the pendency of this proceeding, assets, goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which are being transferred for its benefit, within the jurisdiction at the following financial institutions: ABN Amro Bank; American Express Bank; Banco Popular; Bank of America, N.A.; Bank of China; Bank Leumi USA; The Bank of New York; Bank of Tokyo-Mitsubishi UFJ Ltd.; BNP Paribas; Calyon Investment Bank; Citibank, N.A.; Commerzbank; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; Standard Chartered Bank; Société Générale; UBS AG; Wachovia Bank, N.A.; or any other financial institution within the Southern District of New York.

**WHEREFORE**, plaintiff Golden Ocean Group Limited (Bermuda) prays:

1.     That a summons with process of attachment and garnishment may issue against the defendant G.T. Group Holding a/k/a G.T. Group a/k/a G.T. Group SAL Holding in the amount of US$668,981.50 (including estimated interest, attorneys' fees and costs), and if defendant G.T. Group Holding a/k/a G.T. Group a/k/a G.T. Group SAL Holding cannot be found, then that its goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which is being transferred for its benefit, within the district may be attached in an amount sufficient to answer Golden Ocean's claim;

2.     That defendant G.T. Group Holding a/k/a G.T. Group a/k/a G.T. Group SAL Holding, and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.     That this court recognize and confirm any judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

4.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

5.     That judgment be entered in favor of Golden Ocean Group Limited (Bermuda) and against G.T. Group Holding a/k/a G.T. Group a/k/a G.T. Group SAL Holding in the amount of US$668,981.50 (including estimated interest, attorneys' fees and costs); and,

6.     That this Court grant Golden Ocean Group Limited (Bermuda) such other and further relief which it may deem just and proper.

Dated: New York, New York
      August 21, 2009

                                  HOLLAND & KNIGHT LLP

By:        _____

                                  William J. Honan
                                  Christopher R. Nolan
                                  Warren E. Gluck
                                  HOLLAND & KNIGHT LLP
                                  195 Broadway
                                  New York, New York  10007-3189
                                  Tel.:   (212) 513-3200
                                  Fax:    (212) 385-9010
                                  E-mail:  bill.honan@hklaw.com
                                  chris.nolan@hklaw.com
                                  warren.gluck@hklaw.com

                                  Attorneys for Plaintiff
                                  *Golden Ocean Group Limited (Bermuda)*

## VERIFICATION

STATE OF NEW YORK            )
                             :ss.:
COUNTY OF NEW YORK           )

Warren Gluck, being duly sworn, deposes and says:

I am associated with the firm of Holland & Knight LLP, counsel for Golden Ocean Group Limited (Bermuda) ("Golden Ocean"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Golden Ocean's representative and corresponded with Golden Ocean's representatives regarding this matter. I am authorized by Golden Ocean to make this verification, and the reason for my making it as opposed to an officer or director of Golden Ocean is that there are none within the jurisdiction of this Honorable Court.

_____
                          Warren Gluck

Sworn to before me this
21st day of August, 2009

_____
Notary Public

DIALYZ E. MORALES
Notary Public, State Of New York
No. 01MO6059215
Qualified In New York County
Commission Expires June 25, 2011

9

# EXHIBIT 1

# G.T.GROUP HOLDING

Sarkis and Bakhos Street
Geto Group Bldg.
Jdeidet El Metn
Lebanon
Phone (961) 1 878513   Fax (961) 1 875578

DATE:            February 13th 2009
INVOICE #        005/009

Bill To:         Messrs
                 Golden Ocean Management AS

| DESCRIPTION | AMOUNT |
|---|---|
| *Cost's raised by storage of 50 k wheat for extra time due to delay of M/V Consul Poppe Constanza -Romania  to Umm Qaser  - Iraq* | $   33,000.00 |
| Funds to be transferred to : | |
| Beneficiary:    **G.T.GROUP SAL HOLDING** | |
| Bank name:    **BYBLOS BANK SAL** | |
| **Sassine Branch** | |
| **Elias Sarkis Ave.** | |
| **Achrafieh – Lebanon** | |
| Account No.:   **200.0667980.001** | |
| Swift :    **BYBALBBX** | |
| Correspondant Bank in New York: **BANK OF NEW YORK** **New York** | |
| SUBTOTAL | $   33,000.00 |
| | |
| TOTAL | $   33,000.00 |

Total U.S.Dollars Thirty Three Thousand  Only.

# EXHIBIT 2

Republic of Iraq

Charter Party adapted by The Ministry of Trade of Iraq
for Wheat in bulk originating from Romania
April 2009

Washington, D.C. **April 15, 2009**

IT IS THIS DAY MUTUALLY AGREED between **GOLDEN OCEAN GROUP LIMITED, BERMUDA,** hereinafter referred to as Owners of the **M/V MYRON N** of **Cypriot** flag built **1990** at **Hyundai Heavy Industries Co. Ltd., Ulsan, South Korea** of **23,174** net tons register or thereabouts, classed **Highest** in **Bureau Veritas (BV),** now trading, and THE MINISTRY OF TRADE OF THE REPUBLIC OF IRAQ, Charterers, that the said vessel being tight, staunch, strong and in every way fitted for the voyage shall with all convenient speed sail and proceed to **ONE (1) SAFE BERTH AT ONE (1) SAFE PORT CONSTANZA, ROMANIA** and there load, always afloat, from said Charterers, or their Agents, a full and complete cargo of **50,000** metric tons, **five** percent (**5** %) more or less at Owners' option, of WHEAT in bulk.

Vessel to load under inspection of a licensed inspector appointed by the Supplier and to comply with their rules, not exceeding what she can reasonably stow and carry over and above her Cabin, Tackle, Apparel, Provisions, Fuel and Furniture, and being so loaded shall therewith proceed to UMM QASR, Republic of Iraq, and there deliver the same, not always afloat, but safely aground, agreeable to Bills of Lading on being paid freight as follows:

**Fifty-Four Dollars and Seventy-Five Cents ($ 54.75)** U.S. currency, per metric ton on Bill of Lading quantity basis Free In/Out Spout/Grab Trimmed only and basis loading at one (1) safe berth at one (1) safe port and discharging at one (1) Iraqi Port.

Freight payable: **SEE CLAUSE 26**

Page 2    **M/V MYRON N**                                                    Charter Party dated **April 15, 2009**

1. Owners are to give Charterers and their Agents a minimum of **ten (10)** days' pre-advice and then 7, 5, 3, and 2 days' definite notice of vessel's time of arrival off port of loading. Such pre-advice to be sent to Star Trading & Marine, Inc., Washington, DC, 20036 (E-mail: trastar@startradingmarine.com / Fax: +1 (202) 223-4680). Declaration of cargo quantity required is to be given by Owners at the same time as pre-advice is given. In all cases, stem to be obtained/confirmed through the Agents of the Ministry of Trade (Star Trading & Marine, Inc.).

2. Loading, if required by Charterers, not to commence before the **16th** day of **July, 2009**. Should the vessel not have passed the required inspections at her loading port and not have tendered a valid Notice of Readiness to load cargo before 12:00 Noon on the **22nd** day of **July, 2009**, as evidenced by presentation of said passes to Charterers or their Agents at their office before said hour, the Charterers or their Agents shall at said hour, and at anytime thereafter, but not later than the presentation of these passes at said office, have the option of canceling this Charter Party.

Performing vessel(s) should arrive at the load port within above shipping period, without any advancement/delays.

Owing to the need by the Receivers to maintain the integrity of their schedule for delivery of cargoes, and in the event that a vessel fails to pass the required inspections and tender a valid Notice of Readiness prior to the cancelling date of the Charter Party, and in the event that Charterers' option to cancel is not exercised and the Supplier does not issue an invoice for carrying charges owed, then a Loading Delay penalty of USD 0.20 per metric ton per day, or prorata, will be imposed by Charterers. The Loading Delay penalty is incorporated into Charter Party Clause 25.E listing the documentary requirements for payment of Freight, whereby if a vessel tenders a Notice of Readiness beyond the cancelling date of the Charter Party then Owners will be required to provide either a 'PAID' invoice from the Supplier covering accrued carrying charges or a 'PAID' Loading Delay penalty invoice from Charterers or their Agents.

3. Notification of the vessel's readiness at the load port must be delivered at the office of Charterers' nominated agents and the Supplier's office, vessel also having been entered at the Custom House, accompanied by the licensed inspector's passes of vessel's readiness in all compartments. Laytime shall then commence at 2:00 PM, if valid notice of readiness is given up to and including 12:00 Noon on a working day, and at 8:00 AM next working day if notice given during office hours after 12:00 Noon unless loading is commenced earlier, in which case time shall count from commencement of loading. Shifting time from anchorage or lay berth to loading berth is to be excluded from laytime used.

Any time lost due to vessel not passing inspections or otherwise not being ready to load to be excluded from laytime.

Advice that Vessel's Notice of Readiness to load cargo has been tendered to Suppliers is to be communicated by Owners to Star Trading & Marine, Inc. (E-mail: trastar@startradingmarine.com / Fax: + 1 (202) 223-4680).

4. Prior to tendering N.O.R. to load, Owners are to arrange a separate inspection by a competent inspection authority acceptable to Shippers/Charterers.

Vessel holds to be clean, swept, washed, dried and suitable for loading Charterers intended cargo to shippers' surveyors'/inspectors' satisfaction. Inspector to provide a separate certificate stating that "stowage areas examined are **free from rust scale and residue**, weevils and live insects, are odor free and suitable in all respects to load bulk wheat intended for human consumption." Certificate of vessel's holds cleanliness/suitability must be issued with the above wording without any additions or deletions and said certificate is to be provided to Charterers upon completion of loading.

If vessel fails said inspection, then any and all extra expenses directly incurred thereby to be born by Owners.

**Page 3    M/V MYRON N**                                      **Charter Party dated April 15, 2009**

5. Vessel to be loaded, stowed and spout/grab trimmed free of expense to the vessel at the rate of **6,000** metric tons per weather working day of twenty-four (24) consecutive hours, Saturdays, Sundays and holidays excepted, even if used, and if detained longer than the allowed laytime, Suppliers to pay demurrage as per **Clause 15**.

Extra trimming (over spout/grab trimming), if required, to be at Owners' time, risk and expense.
Cost of separations, if required, other than by vessel's natural compartmentation to be for Owners' account.

6. At loading, vessel's cargo gear and all other equipment shall comply with regulations established by the local Port Authority, longshoremen, and any requirements of the loading facility. If longshoremen are not permitted to work due to failure of the Master and/or Owners and/or Owners' Agents to comply with the aforementioned regulations, then costs of any delay resulting therefrom shall be for Owners' account.

7. Cargo to be fumigated by the grain supplier(s) upon completion of loading at Supplier's expense, and time so used will count as laytime. The vessel's hatches will be sealed by a competent surveyor. The hatch seals should not be tampered with and seals should not be broken until the vessel has arrived at Fujairah, U.A.E. (or alternatively at the discharge port), at which time they will be opened in the presence of Grain Board inspectors.

8. Captain or Owners' Agents to call at Charterers' or their Agents' office as requested and sign Bills of Lading as presented without prejudice to this Charter Party.

9. **SAILING NOTICE AND ESTIMATED TIME OF ARRIVAL**

    A. Sailing Notice indicating vessel's name, port of loading, commodity, quantity loaded, time of sailing and Estimated Time of Arrival (ETA) at al Fujairah and at the discharge port (Umm Qasr) shall be communicated by the Master or Owners (or their Agents) to:

    (1)  The Ministry of Trade – Grain Board of Iraq, Baghdad
             - Attn: Director General
          E-mail: graboirq@yahoo.com;  iraq_grain@hotmail.com

    (2)  Star Trading & Marine, Inc.,  Washington, DC  U.S.A.
          E-mail: trastar@startradingmarine.com  / Fax: + 1 202 223-4680

    (3)  Star Trading & Marine, Inc.'s representative at Basrah, Iraq
             - Attn: Mohammed Saywan
          E-mail: bahadii73@yahoo.com

    (4)  Survey and Inspection Services – Fujairah
             - Attn: Mr. Sharoush Shayegan
          E-mail: adminsis@fujsurvey.com

    B. Thereafter, Notice of Vessel's Estimated Time of Arrival (ETA) at al Fujairah and at the discharge port (Umm Qasr) to be given to each of the parties listed above 15, 10, 7, 5 and 3 days prior to arrival and then 2 days definitive notice of Vessel's Arrival. Forty-eight (48) hours prior to the vessel's estimated arrival at Umm Qasr, the Master or Owners (or their Agents) are to communicate to The Ministry of Trade – Grain Board of Iraq, Baghdad and the Port Authority (via the discharge port agent) the following information:

    (1) Vessel's name and former names (if any) and Year built;
    (2) Flag, port of registry, and call sign; satellite telephone number and E-mail;
    (3) Name of vessel's protective agent, if any;
    (4) Vessel's length overall, gross registered tons, net registered tons, and deadweight;
    (5) Expected draft on arrival;
    (6) Expected date and time of arrival;
    (7) Cargo particulars, including nature, tonnage/weight, stowage by hatches.

**Page 4    M/V MYRON N**                                   Charter Party dated **April 15, 2009**

10. Owners to appoint and pay for agents nominated by Charterers at loading and discharging ports, Owners paying customary agency fees and port disbursements.

      Agents at the discharge port:   **NAIF MARINE SERVICES**
                                                      89/5 PALLESTINE ST.  /  P.O. BOX 2296
                                                      BASRAH, IRAQ

                                                      PIC: VAROOJAN KRIKOR / MANAGING DIRECTOR
                                                      TELEPHONE: + 964 40 623140, + 882 1688847773
                                                      TELEFAX : + 964 40 616056
                                                      MOBILE: + 964 7801004671, + 971 504547994
                                                      E-MAIL: varoojankr@hotmail.com

11. Notification of vessel's readiness to discharge shall be delivered in writing at the office of the Receivers / The Ministry of Trade upon arrival at the discharge port any time, day or night. Charterers are allowed five (5) consecutive days of freetime before laytime commences. Once the five (5) consecutive days have elapsed, laytime to commence immediately (with excepted periods remaining excepted), whether in berth or not. Shifting time from outer port and/or anchorage and/or lay berth to inner harbor and/or quay is to be excluded from laytime used.

12. Panamax-size vessel's length overall not to exceed 900 feet and beam not to exceed 145 feet and her arrival draft at discharging port not to exceed 10.5 Meters salt water even keel. Any lighterage required to reach said draft to be at Owners' risk and expense. Vessel will not be considered ready until Owners have arranged for lightening and vessel has reached said draft. All time lost before vessel reaches said draft is not to count as laytime used and laytime is not to commence prior to 8:00 A.M. on the next working day following completion of lightening.

13. At both load and discharge ports, any fees and/or port charges to be for Owners' account.

14. **Discharging Rates**

Charterers to effect discharge free of risk and expense to the vessel at the average rate of **4,000** metric tons per weather working day of twenty-four (24) consecutive hours, Fridays, Saturdays and holidays excepted, even if used. Discharge rate is basis vessel having minimum five (5) holds or more; if fewer than five (5) holds, then discharge rate to be reduced pro-rata.

15. Demurrage at the loading port(s) shall be payable to Owners at the rate of **Twenty-Three Thousand Dollars ($ 23,000)**, U.S. currency per day for each and every day or pro-rata for part of a day for all laytime used in excess of allowed laytime.

16. Demurrage at the discharging port shall be payable to Owners at the rate of **Twenty-Three Thousand Dollars ($ 23,000)**, U.S. currency per day for each and every day or pro-rata for part of a day for all laytime used in excess of allowed laytime.

17. Despatch shall be payable by Owners at one half of the demurrage rates provided for all laytime saved.

18. Laytime is non-reversible. Demurrage/Despatch at the load port, if any, to be settled between Suppliers and Owners. Demurrage/Despatch at the discharge port, if any, to be settled between Charterers/Receivers and Owners. Charterers to have the option to deduct despatch earned at the discharge port from payment of the 10% balance of freight.

19. **Congestion Clause:** At loading port, if the vessel is unable to berth upon arrival on account berth being occupied, the vessel may tender Notice of Readiness from customary place of waiting by cable, telex, fax or e-mail, whether in berth or not, accompanied by required passes and certificates of vessel's cleanliness and readiness in all compartments, vessel having cleared Customs and in Free Pratique, and laytime to count accordingly, but any time used in shifting from place of waiting to berth shall not count as laytime or time on demurrage.

20. Cost of shifting between berths at loading or turning vessel alongside load berth(s) and discharging ports and all other expenses, including bunker fuel used, to be for Owners' account and time so used to count as laytime or time on demurrage. Vessel to be left in seaworthy trim to master's satisfaction for shifting between berths. Warping i.e. shifting vessel alongside berth, to be performed by crew, if permitted, and time so used to count as laytime or time on demurrage.

21. Charterers'/Suppliers' stevedores are to be employed at loading port(s) and Charterers'/Receivers' stevedores are to be employed at discharge port. Stevedores at load/discharge shall be the servants of the Master and under his supervision and control. Overtime at loading ports and at discharging port is for the account of party ordering same, unless otherwise mutually agreed upon.

22. Grain is to be loaded in clean and unobstructed main holds only (wing tank spaces are not to be used), which must always be accessible to cranes/grabs or vacuvators.

Performing vessel must be equipped with cranes/grabs. However, in case the vessel is not equipped with cranes/grabs, Owners are to provide and pay for vacuvators to discharge the vessel (which to include fuel and technicians to operate the vacuvators). The vacuvators shall be capable of discharging at a daily rate of 5,000 MT provided Charterers can arrange/supply sufficient 'takeaway capacity' (i.e. trucks). Port stevedoring charges at discharging shall be for Charterers' account (in accordance with Clause 14).

Vessel's holds must be suitable and wide enough to allow shore cranes to move easily in all directions without any obstacles. Vessel to permit mechanical gear to be placed on board vessel, in good working order, functioning twenty-four (24) hours a day, on any day for discharging vessel at Charterers'/Receivers' expense. Charterers are permitted to use bulldozers/forklifts in main holds subject to vessel's tank-top strength.

23. Vessel to supply sufficient lights during loading and discharging day and night free of expense to the Charterers.

24. Charterers and/or their Agents have the right to be on board the vessel while loading or discharging for the purpose of supervising their interests.

## 25. FREIGHT PAYMENT

A.  If there is any failure on the part of the ocean carrier to perform the contract after the vessel tendered at the loading port, the Charterers (importing country or its designated agent) shall be entitled to incur all expenses which are required to enable the vessel to undertake and carry out her obligations under the Charter Party, including expenses for lifting any liens asserted against the vessel. Such expenses may be deducted from the freight earned under the Charter Party notwithstanding any prior assignments of freight made by the Owners or Operators.

B.  A Notice of Arrival at discharge must be furnished promptly by Owners/Master to the Charterers/Receivers or its designated agent and must include name of vessel, name of first or sole port of discharge, and date of arrival.

    A Notice of Arrival will not be required in the event the vessel is lost or unable to proceed to destination after completion of loading because of damage caused by the perils of the sea or other waters, collision, stranding, jettison, wreck, fire from any cause, Act of God, public enemies or pirates, or by arrest or restraint of Princes, rulers, or peoples without the fault of the suppliers of the ocean transportation, wars, public disorders, captures or detentions by public authorities in the interest of public safety, provided the vessel Owners or Operators supply evidence satisfactory to Charterers of such disability.

C.  Freight is earned on loading and is payable via wire transfer. 90% of freight is to be paid within 5 working days after completion of loading and signing/release of the Original Bills of Lading marked "Freight payable as per Charter Party" and the 10% balance of freight is to be paid after completion of discharge operations.

Page 6    **M/V MYRON N**                                    Charter Party dated **April 15, 2009**

D.  Final settlement of laytime at the discharge port shall be made against laytime calculation as prepared by Owners and approved by The Ministry of Trade, Baghdad.  Deduction of despatch, if any, will be made at the time of remittance of the 10% balance of freight and also after Owners have paid in full all agency fees, brokerage commissions, vessel disbursements at discharge port, and C&F insurance premiums plus any extra overage premium, (per Clauses 29 and 33).

E.  Freight Payment Documentary Requirements

      **For payment of ninety percent (90%) of freight:**

    (1)    Copy of duly signed Charter Party;

    (2)    Signed Commercial Freight Invoice;

    (3)    Copies of the ocean Bill(s) of Lading marked "On Board";

    (4)    Copy of surveyor's Certification of vessel's cleanliness and readiness to load;

    (5)    An original of the stowage area certificate stating that: "stowage areas examined are **free from rust scale and residue**, weevils and live insects, are odor free and suitable in all respects to load bulk wheat intended for human consumption." (per Clause 4);

    (6)    Evidence of vessel having presented a valid Notice of Readiness on or before canceling time and date in Charter Party (per Clause 3) or a copy of Supplier(s)' invoice covering carrying charges marked "Paid" <u>or</u> a 'PAID' Loading Delay penalty invoice from Charterers (per Clause 2);

    (7)    "Paid" invoice covering brokerage commissions;

      **For payment of ten percent (10%) balance of freight:**

    (1)    Signed Final Freight Invoice showing the deduction of despatch, if any;

    (2)    Statement of Facts and Laytime Statement at discharge port;

    (3)    Evidence of Owners having paid C&F (and overage, if any) insurance premium(s)

      (see Clauses 29 and 33);

**26. Freight Payable:**

    In favor of:    GOLDEN OCEAN Group Limited
    To:          Skandinaviska Enskilda Banken
                Filipstad Brygge 1
                Postboks 1363 Vika
                0123 Oslo
                Oslo, Norway

    SWIFT/BIC:    ESSENOKX
    IBAN:          NO12 97500442321

**27.** For Freight payment, any bank charges are for Owners' account.

**28.** Ministry of Trade guarantees that commodity Letters of Credit shall be fully operative in all respects and received by the Supplier in good order in ample time prior to arrival of performing vessel(s) at loading ports, so that vessels can commence loading operation immediately after arrival respective ports ready in all respects without delay.

## 29. VESSEL DESCRIPTION

M/V MYRON N
EX "MAERSK TASIK"
TYPE: GEARED/GRABBED PANAMAX BULK CARRIER
FLAG: CYPRUS
PORT OF REGISTRY: LIMASSOL
BUILDERS: HYUNDAI HEAVY INDUSTRIES - ULSAN SHIPYARD
DATE DELIVERED: 1990
CLASS: B.V.
LOA: 229.98 M
BREADTH MOULDED: 32.20 M
DEPTH MOULDED: 18.30 M
DWT: 70.424,2 ON 13.218 M DRAUGHT (SUMMER)
INTERNATIONAL: GRT 38,337 / NRT 23,174
7 HOLDS / 7 HATCHES
TOTAL HOLD CAPACITIES (GRAIN):  82.944 CUBM   2.929.171 CBFT
ELECTRIC HYDRAULIC SINGLE DECK CRANE 4 SETS WITH 4 MOTOR GRABS
ALL DETAILS 'ABOUT'

Performing vessel(s) shall be nominated a minimum of ten (10) days prior to readiness to load and shall be single-deck, geared, self-trimming bulkcarriers suitable in all holds for carrying a full and complete cargo of grain without requiring any grain fittings and/or trimming and/or bagging/securing; Oil-bulk-ore vessels and Tankers are excluded. Vessels to conform with harbor or port authorities' limitations at loading and discharging ports.  Vessel must comply with Elevator Tariff at the load port.

Vessel must be in full compliance with regulations and custom of the Port at loading and discharging ports.  Vessel to conform to the latest SOLAS requirements.

Vessels up to maximum **fifteen (15)** years of age are acceptable. Vessels up to twenty (20) years may be considered, however, extra insurance for vessels exceeding **fifteen (15)** years of age to be for Owners' account.  Owners warrant that the vessel is classed 100A1 in Lloyd's Register or equivalent IACS member for the duration of the voyage. Vessel to be fully covered by Marine Insurance and a first class P&I Club acceptable to Charterers.

Owners warrant that the performing vessel is:
        ISM certified
        ISPS certified
        ITF approved

Copies of insurance and other certificates are to be provided to Charterers upon fixture or latest prior to tendering N.O.R. at the load port.

30. Owners undertake that the vessel will sail directly upon completion of loading to al Fujairah, U.A.E. for the required cargo sampling and then to the Iraqi discharge port without any deviation except for purposes of bunkering and any delay or damages to be for Owners' account.  Owners warrant that vessel shall perform voyage at minimum 13 knots, weather permitting and safe navigation excepted.

31.  Vessel to have the privilege of fueling en route.

32. Owners shall not, under any circumstances, sub-contract or sub-let the whole or any part of this shipment to another Owner or operator without first obtaining the written approval of the Charterers, the Ministry of Trade. Transshipment is prohibited.

33. Owners to arrange and pay for cargo insurance on C&F value up to discharging port.

34. War Risk Premium for Vessel and/or crew shall be payable by Owners. Any decrease in the premium after the time of fixing shall be for Charterers' benefit.

35. Vessel to have a lien on the cargo for all freight, dead freight, demurrage or average. Charterers' liability under this Charter to cease on cargo being shipped except for payment of freight, dead freight and/or demurrage. The said Charterers, or their Agents, are to have the privilege of transferring this Charter to others, guaranteeing to the ship-owner the due fulfillment of this Charter.

36. Penalty for non-performance of this agreement is limited to proved damages not exceeding the estimated amount of freight.

37. Any claims or disputes arising from contract and damages or losses, either partially or generally, occurring to the cargo or any similar cases to be settled amicably and then to be referred to arbitration in London and Iraqi substantive law to apply the arbitrators shall be entitled to assume that there is no contradiction between Iraqi English substantive law, and in the event that is, English substantive law to apply.

38. A commission is due on signing this Charter Party on gross freight, deadfreight, and demurrage, vessel lost or not lost, by Owners as follows:

                        2.5% commission payable to Star Trading & Marine, Inc.

39. General Average shall be payable according to York/Antwerp Rules 1974 as amended. Average bond with value declared therein to be signed also sufficient security to be given as required by Master or Agents.

It is also mutually agreed that the Carrier shall not be liable for loss or damage occasioned by causes beyond his control, by perils of the seas or other waters, by fire from any cause or wheresoever occurring, by barratry of the Master or crew, by enemies, pirates or robbers, by arrest and restraint of Princes, rulers or people, by explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery or appurtenances, by collision, stranding or other accidents of navigation of whatsoever kind (even when occasioned by the negligence, default or error in judgment of the pilot, Master, mariners or other servants of the ship-owner, not resulting, however, in any case, from want of due diligence by the Owners of the ship or any of them, or by the ship's Husband or Manager).

40. The required cargo sampling will be performed at the port of al Fujairah, U.A.E.

1. Owners are to allow twelve (12) daylight hours free time at the port of al Fujairah, U.A.E. for the required inspection.
2. The Grain Board's Inspection Team will board the vessel at anchorage and the vessel's hatches will be opened in the presence of the Team.
3. Samples of the cargo will be taken, after which the hatches will be resealed. The samples will be sent by express courier service to Baghdad for analysis.
4. If deemed necessary, the cargo will be fumigated using fumigation material provided by the Grain Board.

Survey and Inspection Services (SIS) – Fujairah has been designated and assigned responsibility for arranging and paying for all costs including transport and accommodations, etc. for the Grain Board inspectors traveling from Baghdad, and for a launch to take the Grain Board's Inspection Team out to the vessel at anchorage. The entire cargo sampling operation is to be conducted at no additional cost to the Grain Board. To this effect, USD 0.50 PMT is to be paid by the Owners to Survey and Inspection Services (SIS) - Fujairah.

Page 9     **M/V MYRON N**                                    Charter Party dated **April 15, 2009**

41. Charterers reserve the right to require Owners to post a Performance Bond. Said Performance Bond shall be in the form of a Cashiers' or Certified Check from a First Class U.S. bank and may be required in an amount up to the equivalent of ten (10) percent of the freight basis the mean offered quantity. The Performance Bond shall be made in favor of the Charterers - the Ministry of Trade, Grain Board of Iraq, and must be provided to Charterers' Agents (Star Trading & Marine, Inc. located at 1050 17th Street, N.W. - Suite 450, Washington, DC 20036 U.S.A.) with Owners' freight offer submission. The Performance Bond shall be returned to Owners after completion of loading of the cargo.

Under no circumstances will the Performance Bond be considered as the maximum liability for damages incurred owing to non-performance on the part of Owners.

42. Either party shall not be liable for default and/or liquidated damages if and to the extent that its failure to perform its obligations under the contract is the result of Force Majeure. Force Majeure shall mean: acts of God M laws or regulation, acts of war, civil disturbances, explosions, natural disasters. Within 24 hours of the occurrence of the Force Majeure, the relevant party shall give written notice and full particulars of the Force Majeure to the other party provided always that such party shall do his best and reasonable effort to obviate or to minimize such failure however in all cases Force Majeure as aforesaid shall not be construed to include any act or circumstance which has been due or in any way attributed to the party claiming Force Majeure or his fault or negligence.

In case of delays in the fulfillment of obligations caused by Force Majeure the relevant party shall be entitled to claim an extension of time and the other party shall determine the extension of time, if any, which shall be reasonable and proper.

43. The following clauses, as attached, are to be considered as fully incorporated in this Charter Party:

    P & I Bunkering Clause

    Centrocon Arbitration Clause

    Amended Centrocon Strike Clause

    Water Pollution Clause

    Chamber of Shipping War Risk Clauses Nos. 1 & 2

    New Jason Clause

    New Both-to-Blame Collision Clause

    BIMCO ISPS/MTSA Clause

**THE MINISTRY OF TRADE**                                    Owners
Charterers
                                           For and on behalf of

By: _____              By:
                                        Golden Ocean Group Limited

Page 10   **M/V MYRON N**                                    Charter Party dated **April 15, 2009**

## PROTECTION & INDEMNITY (P & I) BUNKERING CLAUSE:

The vessel, in addition to all other liberties, shall have liberty, as part of the contract voyage and at any stage thereof, to proceed to any port or ports whatsoever, whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this charter, and there take oil bunkers in any quantity in the discretion of owners, even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

## CENTROCON ARBITRATION CLAUSE:

All disputes from time to time arising out of this contract shall, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying business in London who shall be Members of the Baltic engaged in the Shipping and/or Grain Trades, one to be appointed by each of the parties with power to such Arbitrators to appoint an Umpire. Any claim must be made in writing and Claimant's Arbitrator appointed within twelve months of final discharge and where this provision is not complied with the claim shall be deemed to be waived and absolutely barred. No award shall be questioned or invalidated on the grounds that any of the arbitrators is not qualified on above, unless objection to this acting be taken before the award is made.

## AMENDED CENTROCON STRIKE CLAUSE:

If the cargo cannot be loaded by reasons of riots, civil commotions or of a strike or lock-out of any class of workmen, essential to the loading of the cargo or by reason of obstruction or stoppages beyond the control of the Charterers caused by riots, civil commotions or a strike or lock-out on the railways, or in the docks or other loading places or if the cargo cannot be discharged by reason of riots, civil commotions, or of a strike or lock-out of any class of workmen essential to discharge, the time for loading or discharging, as the case may be, shall not count during the continuance of such causes, provided that a strike or lock-out of the Shippers' and/or Receivers' men shall not prevent demurrage accruing if by the use of reasonable diligence they could have obtained other suitable labor at rates current before the strike or lock-out. In case of any delay by reason of the before-mentioned causes, no claim for damages or demurrage shall be made by the Charterers/Receivers of the cargo or Owners of the steamer. For the purpose, however, of settling despatch rebate accounts any time lost by the steamer through any of the above causes shall be counted as time used in loading or discharging, as the case may be.

## WATER POLLUTION CLAUSE:

Owners warranty to have secured and to carry aboard the vessel a certification of financial responsibility as required under the U.S. Oil Pollution Act of 1990 and any amendments thereto. In addition, owners shall comply with any and all federal, state, provincial, or local regulations pertaining to financial responsibility for water pollution. Any time lost on account of vessel's noncompliance with federal, state, provincial, or local statutory or regulatory requirements pertaining to water pollution shall not count as laytime or time on demurrage and owners shall indemnify charterers for any penalties or damages incurred by charterers as a result of owners' noncompliance with such statutory or regulatory requirements.

Page 11    **M/V MYRON N**                                    Charter Party dated **April 15, 2009**

WAR RISKS CLAUSES:

    1.  No Bills of Lading to be signed for any blockaded port and if the ports of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ship sails or by any other Government, the owner shall discharge the cargo at any other port covered by this Charter Party as ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship has discharged at the port or ports of discharge to which she was originally ordered.

    2.  The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destinations, delivery or otherwise howsoever given by the Government of the Nation under whose flag the vessel sails or any department thereof, or by any person acting or purporting to act with the authority of such Government or of any department thereof, or by any committee or person having, under the terms of War Risks insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfillment of the contract voyage and the freight shall be payable accordingly.

NEW JASON CLAUSE:

    In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

    If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers.  Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

NEW BOTH-TO-BLAME COLLISION CLAUSE:

    If the liability for any collision in which the vessel is involved while performing this Bill of Lading fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

        If the ship comes into collision with another ship as a result of negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying ship or her owners to the owner of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Carrier.

    The foregoing provision shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

BIMCO ISPS/MTSA CLAUSE:

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

(ii) Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

(d) Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

# EXHIBIT 3

**Tord Brath**

From:        panamaxops@clarksons.com
Sent:        25. juni 2009 18:00
To:          V-OPER
Cc:          Michael Grimwade
Subject:     VESSEL SUBSTITUTION - M/V MYRON N - BULK WHEAT FROM
             CONSTANZA,ROMANIA TO UMM QASR, IRAQ


FROM CLARKSONS LONDON

ATTN OPERATIONS

MV MARIA SALAMON (SUB FOR 'MYRON N' SUB FOR 'GOLDEN STRENGTH' SUB FOR 'CONSUL POPPE') CP 15/4/2009 IRAQ MIN. OF TRADE)

FLWG FM CHRTRS

(QUOTE)

**RE: VESSEL SUBSTITUTION - M/V MYRON N - BULK WHEAT FROM CONSTANZA, ROMANIA TO UMM QASR, IRAQ**

WE ARE PLEASED TO CONFIRM THE FOLLOWING VSL SUBSTITUTION FOR **M/V MARIA SALAMON**, DETAILS AS FOLLOWS:

A/C MINISTRY OF TRADE, BAGHDAD

OWNERS/DISPONENT OWNERS: GOLDEN OCEAN, BERMUDA

**M/V MYRON N**
EX "MAERSK TASIK"
TYPE: GEARED/GRABBED PANAMAX BULK CARRIER
FLAG: CYPRUS
PORT OF REGISTRY: LIMASSOL
BUILDERS: HYUNDAI HEAVY INDUSTRIES - ULSAN SHIPYARD
DATE DELIVERED: APRIL 1990
CLASS: B.V.
LOA: 229.98 M
BREADTH MOULDED: 32.20 M
DEPTH MOULDED: 18.30 M
DWT: 70,424.2 ON 13.218 M DRAUGHT (SUMMER)
INTERNATIONAL: GRT 38,337 / NRT 23,174
7 HOLDS / 7 HATCHES
TOTAL HOLD CAPACITIES (GRAIN):  82,944 CUBM   2,929,171 CBFT
ELECTRIC HYDRAULIC SINGLE DECK CRANE 4 SETS WITH 4 MOTOR GRABS
ALL DETAILS 'ABOUT'

COMMODITY: WHEAT IN BULK

QUANTITY: 50,000 MT / 5 PCT MOLOO

LAYCAN: JULY 16-22, 2009

LOADING: 1 SB 1 SP CONSTANZA, ROMANIA

LOADRATE: 6,000 MT PER WWD 24 CONSEC HOURS SATSHEXEIU

DISCHARGING: UMM QASR 10.50 MTRS SWAD NAABSA CLAUSE TO APPLY

PROCEDURE FOR CARGO SAMPLING/INSPECTION AT DISCHARGE:
1. OWNERS TO ALLOW TWELVE (12) DAYLIGHT HOURS FREE TIME AT FUJAIRAH U.A.E. FOR THE
REQUIRED INSPECTION.
2. THE GRAIN BOARD'S INSPECTION TEAM WILL BOARD THE VESSEL AT ANCHORAGE AND THE
VESSEL'S HATCHES WILL BE OPENED IN THE PRESENCE OF THE TEAM.
3. SAMPLES OF THE CARGO WILL BE TAKEN, AFTER WHICH THE HATCHES WILL BE RE-SEALED.
THE SAMPLES WILL BE SENT BY EXPRESS COURIER SERVICE TO BAGHDAD FOR ANALYSIS.
4. IF DEEMED NECESSARY, THE CARGO WILL BE FUMIGATED USING FUMIGATION MATERIAL
PROVIDED BY THE GRAIN BOARD.
5. OWNERS ARE TO PAY MAXIMUM USD 0.50 PMT FOR SUCH PROCEDURE TO SURVEY AND
INSPECTION SERVICES (SIS) U.A.E.

AT DISCHARGE PORT, CHARTERERS ARE ALLOWED FIVE (5) CONSECUTIVE DAYS OF FREETIME
BEFORE LAYTIME COMMENCES. ONCE THE FIVE (5) CONSECUTIVE DAYS HAVE ELAPSED,
LAYTIME TO COMMENCE IMMEDIATELY (WITH EXCEPTED PERIODS REMAINING EXCEPTED),
WHETHER IN BERTH OR NOT.

DISRATE: 4,000 MT PER WWD 24 CONSEC HOURS FRIDAYS, SAT HOLS EXCEPTED EIU

FREIGHT: USD 54.75 PMT FIO SPOUT/GRAB TRIMMED

DEM/DES AT LOADPORT AND DISCHARGE PORT USD 23,000/HD

AT LOADPORT, DEM/DES TO BE SETTLED DIRECTLY BETWEEN SUPPLIER AND OWNERS.

OWNERS TO ARRANGE AND PAY FOR CARGO INSURANCE UP TO DISCHARGE PORT.

EXTRA INSURANCE DUE TO VESSEL EXCEEDING FIFTEEN (15) YEARS OF AGE TO BE FOR
OWNERS' ACCOUNT.

ANY WAR RISK INSURANCE FOR OWNERS' ACCOUNT.

ANY CLAIMS OR DISPUTES ARISING FROM CONTRACT AND DAMAGES OR LOSSES, EITHER
PARTIALLY OR GENERALLY, OCCURRING TO THE CARGO OR ANY SIMILAR CASES TO BE
SETTLED AMICABLY AND THEN TO BE REFERRED TO ARBITRATION IN LONDON AND IRAQI
SUBSTANTIVE LAW TO APPLY THE ARBITRATORS SHALL BE ENTITLED TO ASSUME THAT THERE
IS NO CONTRADICTION BETWEEN IRAQI ENGLISH SUBSTANTIVE LAW, AND IN THE EVENT THAT
IS, ENGLISH SUBSTANTIVE LAW TO APPLY.

ALL OTHER TERMS AND CONDITIONS AS PER CHARTERERS' TENDER TERMS AND MOT/GOLDEN
OCEAN C/P AMENDED TO REFLECT MAINTERMS AGREED ABOVE.

COMMISSION: 2.5 % TO STAR TRADING & MARINE TO BE PAID BY OWNERS.

VESSEL HAS BEEN STEMMED WITH SUPPLIER GT GROUP. THE SUPPLIER HAS ALSO
CONFIRMED CARGO AVAILABILITY PER THEIR BELOW MESSAGE:

---

**From:** George Abdelnour
**Sent:** Thursday, June 25, 2009 10:29 AM
**Subject:** RE: VESSEL SUBSTITUTION - M/V MYRON N - BULK WHEAT FROM ROMANIA TO UMM QASR, IRAQ

Dear Sirs,

We confirm nomination of vessel M/V Myron N ETA July 16/17th 2009 Constanza.

We confirm cargo availability upon vessel arrival.

Best regards,

George Abdelnour
GT GROUP

[END]


BEST REGARDS,

SAEED M. SHEIKH

(UNQUOTE)

BRGDS

CHRIS BURKETT

CLARKSONS DRY CARGO DIVISION
T : 0207 334 3193
M : 0774 704 3193
F : 0870 460 1513
E : panamaxops@clarksons.com


[CMANAGERID:CUB20090625165954]

This message is private and confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply email and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person: to do so could be a breach of confidence.

Emails may be monitored.

Details of Clarkson group companies and their regulators (where applicable) can be found at this url: Disclosure

# EXHIBIT 4

**Tord Brath**

| | |
|---|---|
| **From:** | Sverre Syberg |
| **Sent:** | 10. juni 2009 08:54 |
| **To:** | Tord Brath |
| **Subject:** | FW: M/V MARIA SALAMON w/ (GT Group) Wheat in bulk from Romania to Umm Qasr, Iraq |
| **Attachments:** | 2: M/V MARIA SALAMON w/ (GT Group) Wheat in bulk from Romania to Umm Qasr, Iraq |

**From:** Star Trading & Marine [mailto:trastar@startradingmarine.com]
**Sent:** 9. juni 2009 19:12
**To:** Sverre Syberg
**Cc:** 'Michael Grimwade'
**Subject:** M/V MARIA SALAMON w/ (GT Group) Wheat in bulk from Romania to Umm Qasr, Iraq

Kind Attn: Sverre Syberg
      Cc: Michael Grimwade

Hope that all is well.

Please note the below self-explanatory message concerning M/V MARIA SALAMON received from Supplier GT Group in response to our (attached) message dated June 8th.

Moreover, please be advised that we shall revert regarding the substitution of M/V GOLDEN STRENGTH with M/V MYRON N tomorrow.

Best Regards, Operations
Star Trading & Marine, Inc.

**From:** George Abdelnour [mailto:george.abdelnour@getogroup.com]
**Sent:** Tuesday, June 09, 2009 8:17 AM
**Subject:** RE: M/V MARIA SALAMON w/ (GT Group) Wheat in bulk from Romania to Umm Qasr, Iraq

Dear Sir,

We appreciate your great cooperation regarding below.

We confirm  that the laytime counted while M/V MARIA SALAMON waited at Constanza is added to the laytime for any substitute vessel, which would then be totaled to calculate the final demurrage accrued.  Therefore, We confirm the release of M/V MARIA SALAMON.

Best regards,

George Abdelnour
GT GROUP

# EXHIBIT 5

CODE NAME: "CONGENBILL", EDITION 1994

Page 2

Shipper

**OCEAN BILL OF LADING**   B/L No. 1

**G.T. GROUP HOLDING**
**GETO GROUP BLDG SARKIS AND BAKHOS STREET,**
**P.O. BOX 90750 - JDEIDEH METN LEBANON**
**TEL: 00961 1878513, MOB ZAIN IQ: 07901378176**
**FAX : 00961 1878520, EMAIL: HAGOP_GARCIA@YAHOO.COM**

TO BE USED WITH CHARTER-PARTY DATED
Reference No.
ILCSGT/06108/09 AND S11/5800/2009
CONTRACT NO: MOT/GB/W13/4/2008

Consignee

**TO THE ORDER OF TRADE BANK OF IRAQ, BAGHDAD.**

Notify address
**IRAQI GRAIN BOARD**
**MINISTRY OF TRADE**
**BAGHDAD**
**EMAIL:IRAQ-GRAIN@HOTMAIL.COM**
**IMPORT1@IQGB.ORG**
**IMPORT2@IQGB.ORG**

| Vessel | Port of loading |
|---|---|
| **M/V MYRON N** | **CONSTANZA PORT** |

Port of discharge
**UM-QASER PORT - IRAQ**

| Shipper's description of goods | Gross weight |
|---|---|
| **ROMANIAN HARD WINTER MILLING WHEAT** | **50,659.500 MT** |

**CLEAN ON BOARD**
**FREIGHT PAYABLE AS PER CHARTER PARTY**
**SHIPPED ON BOARD ON 20.08.09**
**PORT OF LOADING : CONSTANZA PORT**
**GOODS HAVE BEEN LOADED ON BOARD OF M/V MYRON N**
**QUANTITY : 50,659.500 MT**

(of wich          NIL          on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

| Freight payable as per CHARTER-PARTY dated   **15.04.2009** | **SHIPPED** | at the Port of Loading in apparent good order and condition on board the vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above. |
|---|---|---|
| FREIGHT ADVANCE. Received on account of freight: | | Weight, measure, quality, quantity, condition, contents and value unknown. IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated bellow all of this tenor and date, any one of wich being accomplished the others shall be void. |
| Time used for loading... ... ...days... ... .hours. | | FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |

| Freight payable at **AS PER C/P** | Place and date of issue **CONSTANZA, 20.08.2009** |
|---|---|
| Number of original Bs/L **3/3 (THREE/THREE)** | Signature **MASTER OF M/V MYRON N** **CAPT. KAMPANIS MICHAIL** |

# BILL OF LADING

TO BE USED WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL "
EDITION 1994
ADOPTED BY
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage

(1)   All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including Law and Arbitration Clause, are herewith incorporated.

(2)   **General Paramount Clause.**

(a)   The Hague Rules contained in the International Convention for the Unification of the certain rules relating to the Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsory applicable, the terms of the said Convention shall apply.

(b)   Trades where Hague-Visby Rules apply.
In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

(c)   The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3)   **General Average.**
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4)   **New Jason Clause.**
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.
If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as a fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5)   **Both-to-Blame Collision Clause.**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of the cargo, freight, destination, etc., see overleaf .

# EXHIBIT 6



*Golden Ocean Managment AS*                    19.08.2009                    Page: 1

M/V    **MARIA SALAMON/MYRON N**

| | |
|---|---|
| Partner | MIN OF TRADE IRAQ |
| From/To | CONSTANZA |
| Details | |
| C/P | CHARTERERS PRO FORMA |
| Calculating | Non reversible; Once on demurrage, always on demurrage |

| | | | |
|---|---|---|---|
| Loading | at | **CONSTANZA** | |
| Calculating | | Non reversible; Counting working time saved | |
| Cargo | mts | 50 500,000 WHEAT | |
| Allowance | mts/day | 6 000,000 | |
| Demurrage rate | /day | 23 000,00 | |
| Despatch rate | /day | 11 500,00 | |
| Excluded | from Sat | 00:00 until Sun 24:00 | |

| | | | |
|---|---|---|---|
| Fri | 29.05.2009 | 02:06 | Vessel arrived |
| Mon | 01.06.2009 | 08:00 | Valid/accepted |
| Tue | 09.06.2009 | 12:00 | Operations completed |
| Mon | **01.06.2009** | **14:00** | Laytime commenced |
| Wed | **19.08.2009** | **24:00** | Operations completed |

| Date | From | Until | % to count | Remarks/Description | Time used | Total time days hh:mm |
|---|---|---|---|---|---|---|
| Mon 01.06.2009 | 14:00 | 24:00 | 100,00 | Laytime | **10:00** | 0 10:00 |
| Tue 02.06.2009 | 00:00 | 24:00 | 100,00 | Laytime | **24:00** | 1 10:00 |
| We 03.06.2009 | 00:00 | 24:00 | 100,00 | Laytime | **24:00** | 2 10:00 |
| Thu 04.06.2009 | 00:00 | 24:00 | 100,00 | Laytime | **24:00** | 3 10:00 |
| Fri 05.06.2009 | 00:00 | 24:00 | 100,00 | Laytime | **24:00** | 4 10:00 |
| Sat 06.06.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | **00:00** | 4 10:00 |
| Sun 07.06.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | **00:00** | 4 10:00 |
| Mon 08.06.2009 | 00:00 | 24:00 | 0,00 | Public holiday | **00:00** | 4 10:00 |
| Tue 09.06.2009 | 00:00 | 12:00 | 100,00 | Laytime | **12:00** | 4 22:00 |
| | 12:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| We 10.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| Thu 11.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| Fri 12.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| Sat 13.06.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | **00:00** | 4 22:00 |
| Sun 14.06.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | **00:00** | 4 22:00 |
| Mon 15.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| Tue 16.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| We 17.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| Thu 18.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| Fri 19.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| Sat 20.06.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | **00:00** | 4 22:00 |
| Sun 21.06.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | **00:00** | 4 22:00 |
| Mon 22.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| Tue 23.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| We 24.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |
| Thu 25.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | **00:00** | 4 22:00 |



*Golden Ocean Managment AS*        19.08.2009        Page: 2

M/V    **MARIA SALAMON/MYRON N**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fri  26.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Sat 27.06.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | 00:00 | 4 | 22:00 |
| Sun 28.06.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | 00:00 | 4 | 22:00 |
| Mon 29.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Tue 30.06.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| We 01.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Thu 02.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Fri  03.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Sat 04.07.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | 00:00 | 4 | 22:00 |
| Sun 05.07.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | 00:00 | 4 | 22:00 |
| Mon 06.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Tue 07.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| We 08.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Thu 09.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Fri  10.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Sat 11.07.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | 00:00 | 4 | 22:00 |
| Sun 12.07.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | 00:00 | 4 | 22:00 |
| Mon 13.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Tue 14.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| We 15.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Thu 16.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Fri  17.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Sat 18.07.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | 00:00 | 4 | 22:00 |
| Sun 19.07.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | 00:00 | 4 | 22:00 |
| Mon 20.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Tue 21.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| We 22.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Thu 23.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Fri  24.07.2009 | 00:00 | 24:00 | 0,00 | Time not to count | 00:00 | 4 | 22:00 |
| Sat 25.07.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | 00:00 | 4 | 22:00 |
| Sun 26.07.2009 | 00:00 | 24:00 | 0,00 | Weekend/Holiday | 00:00 | 4 | 22:00 |
| Mon 27.07.2009 | 00:00 | 24:00 | 100,00 | Laytime | 24:00 | 5 | 22:00 |
| Tue 28.07.2009 | 00:00 | 24:00 | 100,00 | Laytime | 24:00 | 6 | 22:00 |
| We 29.07.2009 | 00:00 | 24:00 | 100,00 | Laytime | 24:00 | 7 | 22:00 |
| Thu 30.07.2009 | 00:00 | 12:00 | 100,00 | Laytime | 12:00 | 8 | 10:00 |
| | 12:00 | | | **Vessel on demurrage** | | | |
| | 12:00 | 24:00 | 100,00 | | 12:00 | 8 | 22:00 |
| Fri  31.07.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 9 | 22:00 |
| Sat 01.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 10 | 22:00 |
| Sun 02.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 11 | 22:00 |
| Mon 03.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 12 | 22:00 |
| Tue 04.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 13 | 22:00 |
| We 05.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 14 | 22:00 |
| Thu 06.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 15 | 22:00 |
| Fri  07.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 16 | 22:00 |
| Sat 08.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 17 | 22:00 |
| Sun 09.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 18 | 22:00 |
| Mon 10.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 19 | 22:00 |



**Golden Ocean Managment AS**                    19.08.2009               Page: 3

M/V       **MARIA SALAMON/MYRON N**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Tue 11.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 20 | 22:00 |
| We 12.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 21 | 22:00 |
| Thu 13.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 22 | 22:00 |
| Fri 14.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 23 | 22:00 |
| Sat 15.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 24 | 22:00 |
| Sun 16.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 25 | 22:00 |
| Mon 17.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 26 | 22:00 |
| Tue 18.08.2009 | 00:00 | 24:00 | 100,00 | | 24:00 | 27 | 22:00 |
| We 19.08.2009 | 00:00 | 24:00 | 100,00 | Operation completed | 24:00 | 28 | 22:00 |

| | |
|---|---|
| Time allowed: | 8 d 10:00 |
| Time used: | 28 d 22:00 |
| **Time lost** | **20 d 12:00** |

| | | | |
|---|---|---|---|
| **Demurrage due:** | 20 d 12:00 hrs at | 23 000,00 /day = | **471 500,00** |